**DUEMLER et al. v. McCABE.**

**Patent Appeal No. 3167.**

Court of Customs and Patent Appeals.
Dec. 30, 1933.

912

Lawrence C. Kingsland, of St. Louis, Mo. (James A. Hoffman, of Washington, D. C., of counsel), for appellants.

Langdon Moore, of Chicago, Ill. (James Atkins, of Washington, D. C., and A. Trevor Jones, of Chicago, Ill., of counsel), for appellee.

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges.

BLAND, Associate Judge.

This is an appeal in an interference case from the decision of the Board of Appeals of the United States Patent Office, awarding priority of the single count involved to the appellee and reversing the decision of the Examiner who had awarded priority to the appellants.

The count involved reads: "2. The combination with a heating element, of a burner, a motor for operating said burner, a power circuit for said motor, a resistance unit connection in the power circuit in series with said motor, a switch for controlling said power circuit, a switch under the influence of combustion conditions of the burner, said switch being normally open and operating upon the establishment of combustion to close and thereby short-circuit the resistance unit preventing further heating thereof, and means for opening the power circuit operable upon a predetermined temperature developed in the resistance unit."

The invention comprises a wiring system and switch control of the motor circuit of motor-operated oil burners in which there is a thermostatic switch, operated by the heat from the burner, to close at a higher temperature and open at a lower temperature, which shunts a resistance, so that, when the said thermostatic switch is open, heat generated by said resistance will affect means whereby a second switch controlling the motor circuit is caused to open, thus cutting off the motor after a controllable time interval. If, for any reason, the oil fails to flow and burn, it will thus be cut off and danger will be avoided.

The devices of the two parties differ slightly in a respect not material here, since the count is broad enough to cover the details of both disclosures.

The interference originally involved a joint application of Walter W. Williams and Ira E. McCabe, filed March 27, 1925, and a joint application of the appellants Duemler and Koeln filed January 19, 1925. Duemler and Koeln filed the customary joint preliminary statement, and Williams and McCabe each filed separate preliminary statements, which were identical, in support of their joint application. The claims of the joint application of Williams and McCabe had been suggested by the Examiner for interference purposes. After the preliminary statements had been examined by the parties and the applications were open to inspection, it was observed that the dates of Williams and McCabe for conception and reduction to practice were later than those of Duemler and Koeln. McCabe then discovered that the issues were so broad that they read upon the work done by him prior to his association with his joint applicant Williams, and that the claim (count here) in the application of Duemler and Koeln did not cover the subject-matter which constituted the joint invention of McCabe and Williams. McCabe thereupon moved that his sole application, filed March 30, 1925, be substituted in the interference for the joint application of Williams and McCabe. The motion was granted, and the interference was redeclared between the sole application of McCabe and the joint application of Duemler and Koeln. A new preliminary statement was requested of McCabe which he filed, and in which his conception and reduction to practice was shown to have occurred prior to the dates shown in the preliminary statement of Duemler and Koeln.

Testimony was taken by both parties. The Examiner of Interferences held that McCabe was restricted to the dates alleged in his preliminary statement made in connection with the joint application of Williams and McCabe, that the mistake was one of law and not of fact and that preliminary statements could not be amended to correct mistakes of law. Upon this view, McCabe was restricted to the dates alleged in his original preliminary statement and priority was awarded to the appellants in count 2, which is the only count involved here. The Examiner of Interferences furthermore held that, in the event that it was subsequently held upon appeal that McCabe was entitled to prove the earlier dates set out in the new preliminary state-

ment, he was under the burden of establishing such dates beyond a reasonable doubt. After reviewing the evidence produced by McCabe, he held that McCabe had not established prior conception beyond a reasonable doubt. The Examiner of Interferences, however, further held that, in event McCabe was permitted to prove dates of conception and reduction to practice in accordance with his second preliminary statement, and if it also be held that the date of the Aladdin burner experiments, hereinafter discussed, had been established beyond a reasonable doubt as being prior to the middle of September, 1924, which is prior to the date of conception to which the senior parties were entitled, it must then be held that such experiments and facts proved in connection therewith amounted to proof of a reduction to practice of count 2.

The Board of Appeals disagreed with the Examiner of Interferences in restricting McCabe to the dates of his original preliminary statement, and held that the substitution of the sole application of McCabe for the joint application of Williams and McCabe brought about "practically a new interference between different parties and as a matter of course necessitated a different statement." Replying to the argument of Duemler and Koeln that it was unfair to them to permit McCabe to file a new preliminary statement after having access to their dates, the Board said: "* * * This may be true as a general proposition but it should have been taken into consideration in the decision on his motion to substitute the sole application. Having once admitted it, we see no ground for holding that he cannot have the benefit of his new preliminary statement. In our opinion he is entitled to the benefit of the dates alleged in his later statement provided they are *clearly established* by the testimony taken on his behalf." (Italics ours.)

The Board further held that, both parties being applicants, McCabe was only required to establish his case by a *preponderance of evidence*.

The decision in this case must necessarily depend upon the effect to be given to the work done by McCabe before he met Williams on December 17, 1924. The record is long, and, in view of our conclusion, it would unnecessarily lengthen this opinion to indulge in a recital of all the happenings related by McCabe and his witnesses. The important, and, as we view it, the controlling, facts only will be referred to.

McCabe in 1921 became associated with the Federal Gauge Company of Chicago, Ill.,

in the development and sale of controls equipped with "Mercoid" mercury switches which he had invented. In 1922 the development of the "Mercoid" control for oil burners was begun. Prior to August, 1924, McCabe was experimenting with an instrument which had a few turns of wire about the cup containing the solder or alloy, which alloy melts on an increase of heat. This alloy, when unmelted, prevents a spring from opening the switch, and was regarded by the tribunals below as involving the inventive concept of the count at issue. These experiments were tests made on an Aladdin oil burner in the showrooms of the Aladdin Oil Burner Company in Chicago, Ill. These tests are claimed to have been made over a period of approximately two months and were discontinued at the request of the general manager of the Aladdin Oil Burner Company, for the reason that the experiments were interfering with sales demonstrations of the burner in the busy season, which comprised the months of August, September, October, and November.

The Examiner of Interferences concluded that there was no sufficient corroboration of the testimony of McCabe relative to what was done in the Aladdin experiments or as to the time when they occurred.

With these preliminary observations in view, it might be well to state at this point the contentions of the appellants:

First. That the tribunals below do not concur upon certain questions, the decision of which rests upon the weight to be given to certain testimony, and that it is the duty of this court to reach an independent conclusion as to the facts, citing Townsend v. Smith, 36 F.(2d) 292, 17 C. C. P. A. 647.

Second. That, under the circumstances, the appellee is in the same position he would be in, with respect to his preliminary statement, as if he had asked to amend the same, and that his testimony so submitted must be regarded with suspicion, and that a greater measure of proof is required under such circumstances than would otherwise be required; that, under such circumstances (if appellee is to be permitted to attempt to prove dates earlier than are shown in the original preliminary statement), he is required to establish conception of an invention in such form as to disclose that he was then "possessed of a definite and permanent idea of the complete and operative invention as it is thereafter to be applied in practice."

Third. That the invention belongs to that class of inventions where the actual reduction to practice must consist in assembling and

testing the whole combination so as to satisfactorily demonstrate the practicability of such combination, relying upon Sydeman v. Thoma, 32 App. D. C. 362. Appellants argue that the testimony clearly shows that McCabe at no time in his Aladdin experimentation obtained satisfactory results, had no workable combination responding to the count, the practicability of which was demonstrated; that the successful combination was only obtained after he met Williams, and Williams told him what to use and where to place it; that, under this view of the case, McCabe neither had a conception nor a reduction to practice because he had not conceived a workable combination, requiring no further experimentation; that, to amount to an invention, the conception should be so complete that nothing further needed to be done but to construct the device or file a patent application.

Fourth. That whatever McCabe did amounted to nothing more than an abandoned experiment.

Fifth. That, even if he is regarded as having conceived the invention during the Aladdin experiments, no reasonable diligence is shown on the part of McCabe from just before the time appellants entered the field until the date when actual reduction to practice was shown.

█ █ In interference proceedings in the Patent Office, in order that justice may be done between the parties and the opportunity for fraud and perjury be minimized, it has always been regarded of the highest importance that the parties should file their preliminary statements setting forth certain information, including the claimed dates of conception and reduction to practice, without being advised as to the dates claimed by their opponents. It has been found, however, that in exceptional cases justice could not be done, and the first inventor could not be given his reward, without permitting amendments after the amending party had become advised of the dates of his opponent.

Amendments are rarely permitted, and properly so, and then only where the party applying for the privileges of amendment has made a very clear showing under well-settled principles of patent jurisprudence. Methudy v. Roy, 65 F.(2d) 171, 20 C. C. P. A. 1142. After amending the preliminary statement, the amender is put under a greater burden than he would have been under had no amendment taken place. The extent of his burden in this respect has been stated in different forms of expression by the Patent Office tribunals and by the courts. All agree that suspicion is immediately cast upon such a party. That a greater burden of proof is required where such suspicions are cast than would otherwise be required seems to follow. Under such circumstances, McCrady's Patent Office Practice, § 337, says: "An extremely strong showing must be made." The Court of Appeals of the District of Columbia, during the many years of reviewing Patent Office decisions, was confronted, on several occasions, with questions somewhat similar to, though not identical with, the one now presented here.

In Parker v. Appert, 8 App. D. C. 270, where amendment had been allowed, and a finding on the facts against the amender had been made by the Patent Office tribunals, the court affirmed the decision below, and there said that such an amendment should be looked upon as a suspicious circumstance.

The rule that an applicant shall prove his case beyond a reasonable doubt is usually applied where one of the parties has a regularly granted patent and the application of the other is filed after such patent is issued. Evans v. Associated Automatic Sprinkler Co. (C. C. A.) 241 F. 252. We know of no decision in the Patent Office or by any court where, as between two applicants for a patent, the burden of proving his case beyond a reasonable doubt is placed on either party. We think it is reasonably well settled that, where amendment is made in the preliminary statements, that fact will be looked upon with suspicion, and the proof of the amender will be carefully scrutinized, and we think it proper to say that under such circumstances material facts must be proved with more clarity and certainty than would otherwise be required. In other words, a suspicion against the claim of the applicant exists, and the proof should be clear and convincing that he is the first inventor.

█ █ Now, in the case at bar, we agree with the Board of Appeals to the extent that this is not exactly a case of amending a preliminary statement. One of the parties was permitted to substitute his sole application, which in effect, if not in fact, resulted in a new interference. Appellee was called upon to file a new preliminary statement. He complied with the Patent Office request. The question as to whether or not the applicant should have been permitted to have substituted his sole application is not before us. We are, however, confronted with the question as to what weight we shall give appellee's evidence relating to acts which occurred earlier than the dates set out in his original preliminary statement, and we are confronted with the ques-

tion as to what burden was imposed upon the appellee. We think he rested under a greater burden than that of establishing his case by a mere preponderance of the evidence. To hold the contrary is to ignore the right of the appellants to have their dates kept secret until their opponent's dates were lodged with the Patent Office. Furthermore, unless some additional burden is placed upon one whose position is that of appellee's, the wholesome purposes sought to be accomplished by the secrecy rule relating to preliminary statements may be avoided.

█ As the record is presented to us, we think the decision of this interference must necessarily depend upon our determination of what facts, in connection with the Aladdin experiments, have been established by clear and convincing evidence. Under the circumstances at bar, we must look upon the appellee's substitution of his sole application for the joint one, and the changing of his preliminary dates for conception and reduction to practice, as a suspicious circumstance to be taken into consideration when considering the evidence offered as proof of his earlier dates. Appellee claims that he did not offer the sole application count, for the purpose of interference, when the interference was originally formed, because he misunderstood the scope of the counts, and that later he discovered that the joint application did not cover the counts but that his sole application did. It will be remembered that he never met Williams until December 17, 1924. The dates of his original preliminary statement necessarily were subsequent to that date. No one knew better than McCabe that whatever joint invention he made with Williams was after December 17, because he had never met Williams before that date. That he was prompted, at least, in part, to move .for the substitution, which would permit him to file another preliminary statement, by the fact that he became advised, 'through his opponents' preliminary statement, of the dates to be relied upon by them, can hardly be questioned. However, we think that, under all the circumstances heretofore recited, he was entitled to prove his earlier dates, but the proof should be clear and the suspicion cast should be removed.

█ With this view, we approach the consideration of the so-called Aladdin experimentation. The Aladdin Company was using a drip switch developed by the Federal Gauge Company for shutting off their burners when the flame went out or the burner failed to ignite. Their chief engineer, Walter L. Colterjohn, asked them for something else to serve this purpose. McCabe advised him that he was already at work on such a device, and Colterjohn then offered him the use of the burners in the demonstration room of the Aladdin Company to assist McCabe in perfecting his device. McCabe testified, in substance, that his furnace control consisted of a "Mercoid" switch in combination with a Bourdon tube so arranged that, when the Bourdon tube was subjected to pressure, it actuated the "Mercoid" switch to make or break the circuit. The circuit would be made at a predetermined rise in pressure and broken at a predetermined fall in pressure. To the Bourdon tube was connected a remote stem by means of a long copper tubing or capillary. The stem and Bourdon tube were loaded with a volatile liquid, acetone, and sealed, so that, when the stem was heated, pressure was created in the Bourdon tube, thus actuating the switch. McCabe in his experiments reversed the tube so that it rested in open position when formerly it had rested in a closed position. The manner in which the instruments comprised the control device was fully described by McCabe in his testimony. McCabe's testimony as to the construction is corroborated by Cotterjohn and by Karl Hunciker and Albert Hogle, who assisted in designing and building the instruments. McCabe and Colterjohn testified that the device operated successfully to cut out the motor and stop the oil feed when the flame went out or the burner failed to ignite, and that the motor circuit remained closed as long as the furnace was heated.

McCabe stated that the safety switch, embodying the count of the interference, which was used in the Aladdin tests, operated within three to four minutes, that is to say, that the desired result was obtained within that length of time, and that this was much more rapid than prevailed with the old drip switch formerly employed. Van Ness stated that it took from eight minutes to an hour to shut off the motor by the use of the old drip switch. Colterjohn testified that the motor actuated by the McCabe device stopped in from five to eight minutes after the oil supply was cut off. This testimony would seem to rebut the contention of the appellants that it is probable that McCabe was experimenting with the drip switch, since it is certain that, if the oil was cut off, the drip switch would never function, as the only way the drip switch could operate was by an overflow of the oil.

The Examiner of Interferences and the Board of Appeals both held that, if the dates of these tests were satisfactorily established, they would be sufficient proof of reduction to

practice of count 2. The Examiner of Interferences held, however, that the date of the tests was not satisfactorily proved. The Examiner of Interferences further held that, in order to establish reduction to practice, it was not necessary to produce a commercial device, and that it was sufficient that the test of the device showed that the device was practical and operative when the proper materials were used, and that the finding of the proper materials required only mechanical skill, and did not involve further invention.

The appellants contend that McCabe never reduced his invention to practice until after he met Williams, and that Williams showed him how to place the stem in the fire box adjacent to the burner, and to cool the same by a draft of air. It appears that McCabe later made stems of a solid rod coated with chromium, and that these were tested by heat supplied by a bunsen burner and were found to resist deterioration which had been prevalent in the experiments and which rendered the device unsatisfactory.

McCabe relies upon his own testimony and the corroborating testimony of Colterjohn to establish his date of reduction to practice. McCabe testified that he first tried his device in connection with a burner used on a boiler furnace, and that he was later requested to transfer it to a hot air furnace where the stack temperature was much higher, and that his thermometer would not register over 600° F.; that he and Colterjohn went to the American Schaeffer & Budenberg Corporation and each purchased a 1,000° F. thermometer. The date of this purchase is fixed by a purchase order of the Federal Gauge Company, and a voucher, both of which are in evidence, and the date of purchase is August 13, 1924. Colterjohn's testimony fully corroborates this phase of McCabe's testimony.

The Examiner of Interferences held that this failed to establish the date of the tests, since it was not shown that the thermometer was used in the making of the tests, but McCabe testified that it was so used, and Colterjohn was asked what they did after they purchased the new thermometers, and he replied that "he [McCabe] took further readings of the stack temperatures on the furnace." It seems obvious that he must have used the new thermometer in the Aladdin experiments, since Colterjohn states that they measured a stack temperature of around 850°. Hogle states that they measured temperatures around 850° or 900°. Colterjohn says that the tests took approximately two months, and that the general manager of the Aladdin Company, Mr. Crooks, requested McCabe to discontinue the tests as they interfered with demonstrations, as the busy season was coming on, and that the usual busy season was August, September, October, and November. Thus it appears that the tests continued somewhat into the busy season.

Hunciker testified that he saw the device in operation at the Aladdin Company the same year he started to work for McCabe, and that "it was around August—real hot weather." He went to work for McCabe in May or June, 1924.

These facts seem to prove that the Aladdin tests, which, according to the concurring views of both tribunals below, amounted to a reduction to practice of the invention covered by the count involved, took place in August, 1924. McCabe met Williams on December 17, 1924, and it was not long after this until the device which had been invented by McCabe became part of the system which fully met the requirements for the Oil-O-Matic burner and was put into commercial production.

Features of the system put into production were involved in count 1 which was before the Examiner of Interferences and the Board, the priority in which count was awarded to the appellants herein, and from which award the appellee, McCabe, took no appeal. With the particulars of construction of the device as related to count 1, we are not concerned.

It will thus be seen that the real point in controversy which is decisive of the issue at bar is, Did the experimentation in the Aladdin Company occur during August, 1924, or prior thereto? We think the record shows that it did so occur. This was prior to any date claimed or awarded to appellants. The earliest date appellants claimed for conception was September 13, 1924. Notwithstanding the burden devolving upon McCabe in respect to the Aladdin experiments, by virtue of his having knowledge of the appellant's dates before filing his own, we think the proof stands the test required. While the facts of the record may require that we regard the change of dates by McCabe as a suspicious circumstance, and should require that we scrutinize with more than ordinary care the offered testimony supporting the new dates, we find nothing in the testimony or the circumstances surrounding its taking that reflects against the credibility of the witnesses, or the truthfulness of the testimony offered. While it is true that the date in August, 1924, is established by related circumstances, the facts and circumstances related carry the conviction that the tests were made in the Aladdin showroom and

that they could not have been made there later than in August.

Appellants have urged here and before the tribunals below that McCabe visited the plant of the Home Appliance Corporation in October and there received knowledge of appellants' invention. Both tribunals below, upon evidence not necessary to discuss here, held that such a conclusion was unjustifiable, and, after considering this evidence, we find no reason for arriving at a different conclusion.

The decision of the Board of Appeals, awarding priority of the invention in count 2 to Ira E. McCabe, the junior party, is affirmed.

Affirmed.